**Terrance KNOWLES and Lawrence Ebner, Plaintiffs,**

v.

**The UNITED STATES COAST GUARD, the Council on Environmental Quality, the Advisory Council on Historic Preservation, and the United States Environmental Protection Agency, Defendants.**

**No. 96 Civ. 1018 (JFK).**

United States District Court, S.D. New York.

May 8, 1996.

Antonia Levine, New York City, for Plaintiffs.

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Daniel S. Alter, Asst. U.S. Atty., of counsel), for Defendants.

## OPINION AND ORDER

KEENAN, District Judge:

Before the Court is Plaintiffs' motion for a preliminary injunction, pursuant to Fed. R.Civ.P. 65, seeking to bar the United States Coast Guard (the "Coast Guard") from proceeding with its plan to close its Support Center on Governors Island pending the Coast Guard's compliance with the National Environmental Policy Act of 1969 ("NEPA"), 83 Stat. 852, as amended, 42 U.S.C. § 4321 *et seq.* Also before the Court is Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), or in the alternative for summary judgment, on the ground of Plaintiffs' lack of standing. For the reasons set forth below, the Court denies Defendants' motion to dismiss for lack of subject matter jurisdiction,

grants Plaintiffs leave to amend the complaint to the extent set forth below, and denies Plaintiffs' motion for a preliminary injunction. The Court holds Defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), or in the alternative for summary judgment, in abeyance pending the receipt of supplemental memoranda of law.

## FINDINGS OF FACT

Plaintiffs seek a preliminary injunction preventing the imminent departure of the Coast Guard from .its Support Center on Governors Island. Plaintiffs claim that the Coast Guard, motivated by economic concerns, made the decision to abandon the island without taking the "hard look" at the environmental consequences of its decision required by NEPA. Plaintiffs specifically allege that the Coast Guard violated NEPA by issuing a Finding of No Significant Impact ("FONSI") based on an Environmental Assessment ("EA") of the effects of closing the Support Center. Plaintiffs contend that NEPA required the Coast Guard to prepare a more rigorous and comprehensive analysis of the effects of closure, known as an Environmental Impact Statement ("EIS"), before making its decision to close the Support Center. Because the Coast Guard plans to begin transferring major personnel and operational units from Governors Island on May 10, 1996, this matter has been dealt with on an expedited basis. The Court heard oral argument on May 1, 1996, and now makes the following findings of fact.

### Governors Island [1]

Governors Island comprises approximately 175 acres in New York Harbor, just south of the borough of Manhattan and west of the borough of Brooklyn. During most of the last three centuries, the island has served as a military facility, first for the Department of the Army and, since 1966, for the Coast Guard. Because of its strategic location, the island has played roles in the Revolutionary War, the War of 1812, the Civil War, and World Wars I and II.

Governors Island has a rich and colorful history. In 1637, the Dutch West India Company purchased the island from Native Americans "for two ax heads, a bunch of string beads and some iron nails." Stefan Fatsis, *Big–City Plans for a Tiny Island Village*, Wall Street J., Mar. 29, 1996, at B12 (hereinafter *"Big–City Plans"*). Originally called "Pagganck" by Native Americans, the current name of the island derives from the early residence there of New Amsterdam's first governor, Wouter Van Twiller.

Governors Island has been put to diverse uses throughout its history, including use as a tobacco plantation (1639), a quarantine station for Palatine Germans (1710), a military station for American Revolutionary War troops (1776), a prison for Confederate Soldiers during the Civil War (1862), and a secure meeting place for important officials, including Ronald Reagan and Mikhail Gorbachev (1988). In 1913, the island also served as a depository for debris from the construction of the New York City subway system, which restored the island to its present size after erosion had dwindled it from 170 acres in the early 1600s to only 70 acres in 1900.

Governors Island retains numerous structural legacies of its military past. Two fortifications known as Fort Jay and Castle Williams, built in the late 1700s and early 1800s, respectively, still stand. In addition, the island's northern half was designated a National Historic Landmark District in 1985. More than sixty structures and elements have been designated as "contributing elements" of the National Historic Landmark.

Governors Island currently houses the Coast Guard's New York Support Center. The Support Center is the Coast Guard's largest facility in the world and serves as a base for approximately twenty-five Coast Guard command operations. The island has approximately 4,000 residents, 115 buildings, and recreation areas that include a parade ground that is also used as a nine-hole golf course.

---

1. Except where otherwise indicated, the information in this section is taken from the Final EA for the Closure of Governors Island 2–3, 7, 65–68.

### The Closure Process

Over the years, the Coast Guard has repeatedly considered closing the Support Center on Governors Island for budgetary reasons. Most recently, in 1989, and again in 1993 and 1994, the Coast Guard conducted formal studies to assess the operational and economic ramifications of closing the Support Center. The Coast Guard determined from the studies that it could save approximately $33 million per year by ceasing operations on Governors Island.

The Coast Guard thereafter hired a private environmental consulting firm to prepare an Environmental Assessment ("EA") to assess whether closure of the Support Center would have a significant environmental impact within the meaning of NEPA. In February 1995, the Coast Guard made a draft EA available to various agencies, organizations, and other potentially interested parties for public comment. The Coast Guard also published notice of the availability of the draft EA in the Governors Island Gazette.

In response to comments and criticisms it received, the Coast Guard revised the draft EA. In June 1995, the Coast Guard published notice of the availability of a final EA and a draft FONSI for comment in the Federal Register, the New York Daily News, and the Governors Island Gazette. The Coast Guard also mailed copies of the final EA and draft FONSI to approximately 60 agencies, organizations, and interested parties. After receiving and responding to further agency and public comment, Coast Guard officials signed the Governors Island FONSI on August 2, 1995. On October 16, 1995, the Coast Guard Commandant approved the plan to close the Support Center. As noted above, the first waves of relocation of personnel are scheduled to begin on May 10, 1996. The closing of operations on the base is to continue throughout the summer, with the final closing day expected to be at the end of August 1996. *See* Feb. 27 Hearing Tr. at 4.

### The Instant Action

Plaintiffs commenced this lawsuit with the filing of a *pro se* complaint on February 9, 1996. At the time of the filing of the complaint, plaintiff Terrance Knowles was employed as an Environmental Protection Specialist to the Coast Guard on Governors Island.[2] Plaintiff Lawrence Ebner is a retired United States Army Lieutenant Colonel residing in Wethersfield, Connecticut. Plaintiffs bring claims against the Coast Guard, the Council on Environmental Quality, the Advisory Council on Historic Preservation, and the United States Environmental Protection Agency under NEPA, the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.*, the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Civil Service Act of 1883 (the Pendleton Act), and various federal ethics regulations. Plaintiffs' motion for a preliminary injunction seeks to enjoin only the Coast Guard, although all Defendants oppose the motion. Plaintiffs seek injunctive relief solely under NEPA.[3]

Together with the filing of the *pro se* complaint on February 9, 1996, Plaintiffs moved by Order to Show Cause for a temporary restraining order and preliminary injunction. On the same day, United States District Judge Charles S. Haight, sitting in the Emergency Relief Part, Part I, denied Plaintiffs' request for a temporary restraining order, finding that Plaintiffs had made an insufficient showing of irreparable harm to warrant such relief. Judge Haight also scheduled a hearing on Plaintiffs' motion for a preliminary injunction to take place before United States District Judge Lewis A. Kaplan later that month. After an initial confer-

---

**2.** Since filing this action, and in anticipation of the elimination of his position on Governors Island due to the Coast Guard's plans for closure of the Support Center, Mr. Knowles accepted a position with the Coast Guard in Virginia, where he now resides.

**3.** Plaintiffs initially also sought injunctive relief based on the Coast Guard's alleged failure to comply with § 106 of the NHPA. They concede that this claim was rendered moot—at least for purposes of the motion for a preliminary injunction—by the signing of the Programmatic Agreement providing for post-closure maintenance of the historic buildings on Governors Island, as discussed *infra*.

ence before Judge Kaplan, and before the hearing could be held, the action was reassigned to the writer. Plaintiffs retained legal counsel during the pendency of this preliminary injunction motion, and thus no longer proceed *pro se.*

Plaintiffs are chiefly concerned with the impact closure will have on Governors Island's historic structures. They also express concern with the ultimate disposition of the island after the closure process is complete. Plaintiffs anticipate that the Coast Guard will "excess" the Island after the closure process is complete, setting the stage for public sale of Governors Island by the General Services Administration.

There is no question that there is an abundance of interest in the future of Governors Island. Already, the City of New York has established a task force on the future of the island. "Architects, developers, urban planners, civic leaders and government officials are [also reportedly] eying the island[,] [with] [i]deas ... rang[ing] from a gambling casino to one writer's fanciful Grateful Dead theme park. Other suggestions: high-rise apartments, a new city neighborhood, an educational institution, a corporate conference center." *Big–City Plans, supra; see also* Robin Pogrebin, *Setting Sail with Yoga: 'Om' Helps Ease Stress of Base's Closing,* N.Y. Times, Mar. 30, 1996, at A2 ("With breath-taking views of Manhattan skyline and the Statue of Liberty, the island also represents one of the most prime pieces of real estate in New York City."); Robert Monroe, *Governors Island Sale Tantalizes Developers: Coast Guard Plans to Close Base in 1998,* Sun–Sentinel (Ft. Lauderdale), Oct. 22, 1995, at 6A ("Developer Donald Trump says the island is 'great visually, great artistically and great for security'— conjuring visions of a moated, high-rise community for the mega-rich.").[4]

While this action raises a multitude of issues of public concern, the Court addresses only two on the instant applications: first, whether Plaintiffs have standing to maintain this action and, second, whether Plaintiffs have established that preliminary injunctive relief is warranted. The Court examines each in turn below.

## CONCLUSIONS OF LAW

### I. Standing

The Court first confronts the threshold justiciability question of whether Plaintiffs have standing to maintain this action. Defendants have moved to dismiss, or in the alternative for summary judgment, on the ground that both Plaintiffs lack standing. Plaintiffs have each submitted an affidavit supplementing and elaborating upon the allegations of the complaint concerning their standing to bring this action. These affidavits are submitted (1) in support of the motion for a preliminary injunction, (2) in opposition to Defendants' motions, and (3) in support of a motion to amend the complaint should the court deem amendment necessary for Plaintiffs to establish standing. As discussed below, the Court finds that Ebner has standing to maintain this lawsuit and thus denies Defendants' Fed.R.Civ.P. 12(b)(1) motion to dismiss for lack of standing. The Court therefore need not reach the question of Knowles' standing. The Court also grants Plaintiffs leave to amend the complaint to allege additional facts relating to standing.

#### A. *Legal Standards*

■ The doctrine of standing involves both constitutional and prudential considerations. The constitutional basis for the standing requirement derives from Article III of the United States Constitution, which instructs that the judicial power extends only to "Cases" or "Controversies." The Supreme Court in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), articulated the Article III requirements for standing as follows:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]' " Second, there must be a causal connection

---

**4.** As the writer observed at oral argument, about all that has not been proposed as a future use for the island is housing the New York Yankees there should they leave their stadium in the Bronx.

between the injury and the conduct complained of—the injury has to be "fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.,* 504 U.S. at 560–61, 112 S.Ct. at 2136 (citations omitted).

Even if a plaintiff satisfies the constitutional requirements of standing, " 'a court may nevertheless deny standing for prudential reasons.' " *Comer v. Cisneros,* 37 F.3d 775, 787 (2d Cir.1994) (quoting *Lamont v. Woods,* 948 F.2d 825, 829 (2d Cir.1991)). Prudential considerations, while not mandated by Article III, act as "rules of judicial 'self-restraint.' " *Sullivan v. Syracuse Housing Auth.,* 962 F.2d 1101, 1106 (2d Cir.1992). Prudential considerations

suggest that a plaintiff generally may not rest his claim on the legal rights of a third-party; that courts generally should refrain from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances"; and that the interest asserted by the plaintiff should be "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."

*Id.* at 1106 (citations omitted).

■ This last prudential consideration, requiring that the plaintiff's injury fall within the "zone of interests" of the statute he or she seeks to enforce, in this case is mandated by the APA. Because NEPA does not provide a private right of action for violations of its provisions, plaintiffs proceeding under NEPA must establish standing under the APA. The APA confers a right to seek injunctive relief to those persons "adversely affected or aggrieved by [final] agency action within the meaning of a relevant statute." 5 U.S.C. § 702; *see also* 5 U.S.C. § 704 ("agency action" referred to in § 702 means "final agency action"). A plaintiff suing under the APA for a violation of NEPA is therefore required to establish, in addition to constitutional standing, that the injury allegedly suffered by him falls within the "zone of

interests" that the statute was designed to protect. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *see also Douglas County v. Babbitt,* 48 F.3d 1495, 1499 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996); *Sabine River Auth. v. United States Dep't of Interior,* 951 F.2d 669, 675 (5th Cir.), *cert. denied,* 506 U.S. 823, 113 S.Ct. 75, 121 L.Ed.2d 40 (1992).

■ NEPA was enacted "to promote efforts that will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321 (1988). NEPA's "zone of interests" has thus been construed to encompass claims for injury to the recreational use, aesthetics, or well-being of the human environment. *National Wildlife Federation,* 497 U.S. at 886, 110 S.Ct. at 3187 ("We have no doubt that 'recreational use and aesthetic enjoyment' are among the *sorts* of interests those statutes were specifically designed to protect."); *accord Sabine River Auth.,* 951 F.2d at 674 (citing *Save Our Wetlands,. Inc. v. Sands,* 711 F.2d 634, 640 (5th Cir.1983)). Economic injury, by contrast, does not fall within NEPA's zone of interests. *See Douglas County,* 48 F.3d at 1499; *Sabine River Auth,* 951 F.2d at 676.

■ The burden of proof is on the plaintiff to establish the elements of standing. *Board of Education v. New York State Teachers Retirement System,* 60 F.3d 106, 109 (2d Cir.1995). The level of proof required to demonstrate standing increases as the litigation progresses.

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim[.]" In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed.Rule Civ.Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true.

*Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2137.

### B. *Analysis*

Defendants claim that both Plaintiffs lack the requisite "concrete interest" in this action to establish constitutional standing because they have no "geographical nexus" to Governors Island. Defendants also assert that Knowles' claims fall outside the "zone of interests" to be protected by NEPA. The Court first examines whether Mr. Ebner has standing to maintain this action.

The complaint avers the following facts relating to Ebner's standing. Ebner is a retired U.S. Army Lieutenant Colonel residing in Wethersfield, Connecticut. While in the Army, he served on Governors Island from 1959 until 1960, when the island was used as First Army Headquarters. Ebner is a member of several historical societies and authored "The Resolution on Governors Island," which was passed by the local Retired Officers Association Chapters in opposition to closure of the Support Center. Ebner claims that if the Coast Guard leaves Governors Island, he and other retirees and reservists "will suffer the impact of not having this military facility available." Compl. ¶ 34.

█ These allegations are plainly insufficient to establish standing. *See New York State Teachers Retirement Sys.,* 60 F.3d at 109 (it is plaintiff's burden " 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute' ") (citation omitted). While the complaint describes the reasons for Ebner's *interest* in Governors Island, it fails to allege his actual *use* of the island, as required to establish standing under NEPA. *National Wildlife Federation,* 497 U.S. at 887–89, 110 S.Ct. at 3188–89 (finding that plaintiff claiming injury from federal action damaging environment must allege use of specific area affected by challenged activity). Nor does Ebner plead other facts upon which the Court could find that injury to Governors Island will somehow be "reflected" to Ebner where he currently resides—a distance of approximately 100 miles from Governors Island. *Cf. Defenders of Wildlife,* 504 U.S. at 567 n. 3, 112 S.Ct. at 2140 n. 3 ("The dissent may be correct that

the geographic remoteness of [plaintiffs] ... from [the site of the alleged injury] does not *'necessarily'* prevent ... a finding [of concrete injury]—but it assuredly does so when no further facts have been brought forward ... showing that the impact ... will in some fashion be reflected [where plaintiffs are located]."); *Kelley v. Selin,* 42 F.3d 1501, 1509 (6th Cir.) (finding landowners "in close proximity" to nuclear plant had standing to challenge approval of spent fuel storage tank), *cert. denied,* —— U.S. ——, 115 S.Ct. 2611, 132 L.Ed.2d 855 (1995).

The Court finds, however, that the additional allegations in Ebner's affidavit, together with the representations of his counsel at the oral argument, rectify the factual deficiencies of the complaint and establish Ebner's standing. In the supplemental affidavit, Ebner describes his connection with Governors Island as follows:

> My wife and I travel to New York City from Wethersfield as often as we can and can afford, lately at least three times a year. One of our major objectives and enjoyments is revisiting Governor's Island where we walk through the historic district, shop in the local military facilities and relax at an affordable location in a city we love.

Ebner Aff. ¶ 5. In addition, Plaintiffs' counsel represented at the argument that Ebner (who appeared in Court to observe the argument) was at that time staying on Governors Island and that he planned to return to the island on May 11 and 12. May 1 Hearing Transcript ("May 1 Tr.") at 7–8. Plaintiffs' counsel also referred to Ebner's history of visiting the island "over the years." *Id.* at 36.

█ The Court finds that these facts establish the necessary "concrete injury" to demonstrate that Ebner has a "personal stake" in the effects of closure of Governors Island. In addition, the prospect of injury to Ebner's aesthetic and recreational interest in the historical sites on Governors Island is within the zone of interests to be protected by NEPA. Because Plaintiffs drafted the complaint *pro se,* the Court grants Plaintiffs' motion to amend the complaint to allege additional facts relating to standing. *See D'Ag-*

*nillo v. United States Dep't of Housing & Urban Development*, 738 F.Supp. 1443, 1449 (S.D.N.Y.1990) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (per curiam)), *aff'd*, 923 F.2d 17 (2d Cir.), *cert. denied*, 501 U.S. 1254, 111 S.Ct. 2898, 115 L.Ed.2d 1062 (1991).

Although Defendants rely on the Supreme Court's decision in *Defenders of Wildlife*, 504 U.S. at 555, 112 S.Ct. at 2130, in arguing that Ebner lacks standing, the above facts distinguish Ebner from the plaintiffs seeking to establish standing in that action. The plaintiffs in *Defenders of Wildlife*, who were wildlife conservation and environmental organizations, contended that the Endangered Species Act of 1973 mandated that federal agencies consult with the Department of the Interior to ensure that their actions abroad did not destroy habitat of endangered species. Plaintiffs sought to establish standing through the affidavits of two members of Defenders of Wildlife, who had travelled to Egypt and Sri Lanka, respectively, and had observed endangered species in those countries. Both members, in their affidavits, described their past experiences viewing wildlife abroad and expressed the "hope" and "intent" to return to the countries they had visited in order to observe endangered species. The member who had visited Sri Lanka, when questioned at a subsequent deposition about her plans to return to that country, acknowledged that she had no present plans to return, stating "I don't know [when]. There is a civil war going on right now. I don't know. Not next year, I will say. In the future." *Id.* at 564, 112 S.Ct. at 2138.

The Court found that the members' affidavits failed to sufficiently allege "injury in fact" because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy ... if unaccompanied by any continuing, present adverse effects." *Id.* at 564, 112 S.Ct. at 2138 (quotations omitted). The Court further opined that

> the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered spe-

cies—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the "actual and imminent" injury that our cases require.

*Id.* The Court also noted that where the plaintiff's exposure to the injury is "at least partly within the plaintiff's own control," a "high degree of immediacy" is required, "so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.* at 564 n. 2, 112 S.Ct. at 2138 n. 2 (citations omitted).

In contrast to the plaintiffs in *Defenders of Wildlife*, Ebner has demonstrated that "he will soon expose *himself* to the injury." *Id.* (citations omitted). Ebner not only has regularly visited the island in the past, but he will also do so in the future. Indeed, he has even provided the Court with a date certain for his return. The Court is thus not presented, as was the Supreme Court in *Defenders of Wildlife*, with a nebulous plan to "some day" return to the island, but rather a concrete representation that Ebner's return is imminent. Ebner's plans to visit Governors Island on May 11 and 12 evidence the requisite "high degree of immediacy" of injury to demonstrate his personal stake in the outcome of this action.

The Court therefore denies Defendants' motion for summary judgment for Plaintiffs' lack of standing. The Court grants Ebner's motion to amend the complaint to assert the additional facts supporting standing. Because the Court finds that the proposed amendments to the complaint establish Ebner's standing, it need not reach the question of Knowles' standing. *Bowen v. Kendrick*, 487 U.S. 589, 620 n. 15, 108 S.Ct. 2562, 2580 n. 15, 101 L.Ed.2d 520 (1988); *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981).

## II. Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs claim that they meet the test for obtaining a preliminary injunction under Fed.R.Civ.P. 65 because they have demonstrated that they will be irreparably harmed

absent an injunction barring closure of the island and that they are likely to succeed on the merits of their claims. Defendants, in opposition, argue that Plaintiffs have failed to demonstrate either of those elements. Because the Court finds that Plaintiffs fail to demonstrate that they will suffer irreparable harm in the absence of injunctive relief, it denies the motion for a preliminary injunction.

## A. *Preliminary Injunction Standards*

■ To obtain a preliminary injunction in this Circuit, the moving party generally has the burden of demonstrating " '(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.' " *NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir.1995) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir. 1991)). Where the movant seeks to enjoin governmental action "taken in the public interest pursuant to a statutory or regulatory scheme," the movant must meet its burden under the more stringent "likelihood of success" standard rather than "the less rigorous fair-ground-for-litigation standard." *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989) (citing *Union Carbide Agricultural Products Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir.1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981); *Medical Society of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir. 1977)); *accord Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995); *L.S.S. Leasing Corp. v. United States General Services Admin.*, 579 F.Supp. 1565, 1568 (S.D.N.Y.1984) ("[W]here the public interest is involved, 'more than a "fair ground for litigation" must be shown before the action will be stopped in its tracks by court order.' ") (quoting *Union Carbide*, 632 F.2d at 1018).

■ The first element, irreparable harm, is the "single most important prerequisite for the issuance of a preliminary injunction." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990). *See also Town of East Haven*, 70 F.3d at 224; *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1295 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). The Second Circuit has described irreparable harm as injury that "is likely and imminent, not remote or speculative, and that ... is not capable of being fully remedied by money damages." *Town of East Haven*, 70 F.3d at 224 (citing *Reuters Ltd.*, 903 F.2d at 907; *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989)); *accord Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir.1995).

## B. *NEPA Standards*

■ NEPA was designed with the ultimate goal of protecting the human environment by ensuring that federal agencies "carefully consider detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). It was also intended to "guarantee[ ] that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Id.*

NEPA requires federal agencies to prepare what is known as an Environmental Impact Statement ("EIS") once the agency has determined that it is about to engage in "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To assist in determining whether a proposed federal action will have a "significant impact" on the environment, thus triggering the need to prepare a costly and time-consuming EIS, the regulations of the federal Council on Environmental Quality permit federal agencies to first make a preliminary "Environmental Assessment" ("EA"). 40 C.F.R. §§ 1501.3, 1501.4, 1508.9, 1508.27 (1995). "According to these regulations, the EA is a 'concise' document that 'briefly' discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a 'Finding of No Significant Impact' (called in environmental jargon, a 'FONSI')." *Sierra Club v. Marsh*, 769 F.2d 868, 870 (1st

Cir.1985) (citing 40 C.F.R. §§ 1508.9, 1508.13).

■ Although NEPA is thus essentially a procedural statute, a plaintiff who is able to prove a federal agency's failure to abide by NEPA's requirements is not, per se, entitled to injunctive relief. In *Town of Huntington v. Marsh*, 884 F.2d 648, 651 (2d Cir.1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990), the Second Circuit, in an action brought pursuant, *inter alia*, to NEPA, held that "injunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations." As with all preliminary injunctions, "a threat of irreparable injury must be proved, not assumed, and may not be postulated eo ipso on the basis of procedural violations of NEPA." *Id.* at 653. Plaintiffs who assert rights under NEPA are therefore required to demonstrate that if a preliminary injunction does not issue, they will suffer the imminent irreparable harm NEPA is designed to protect against: a significant adverse effect on the human environment. *See D'Agnillo*, 738 F.Supp. at 1456.

### C. *Analysis*

Plaintiffs argue that they face irreparable harm in the form of "significant impacts" on Governors Island's historic structures if an injunction does not issue enjoining the Coast Guard from making further efforts to close the Support Center. Plaintiffs allege specifically that (1) the Coast Guard's failure to prepare an EIS for the Support Center's closure and its failure to assess the impacts of its decision to excess the island "has subjected the Island [specifically, the historical structures] to the risk of serious environmental harm during a substantial period of disuse"; and (2) the Coast Guard's failure "adequately to assess the impacts from the reasonably foreseeable consequences of its decision to close the Island, i.e. disposition/reuse ... giv[es] rise to the potential for significant impacts on the historic structures from future use." Pl. Mem. of Law at 14.[5]

Thus, Plaintiffs base their claims of irreparable harm on potential injury to the historic buildings both immediately after closure of the Support Center and in "the future."

The precise question for the Court is whether Plaintiffs have demonstrated that closure of the island will result in immediate irreparable harm in the form of "significant adverse impact" upon Governors Island's historical structures. *Cf. D'Agnillo v. Hill*, No. 89 Civ. 5609, 1995 WL 110597, at *3 (S.D.N.Y. Mar. 15, 1995), *aff'd*, —— F.3d ——, No. 95 Civ. 6133, 1996 WL 47993 (2d Cir. Feb. 2, 1996). The Court finds that they have not.

Plaintiffs ground their application on the Coast Guard's alleged failure to comply with NEPA by not preparing an EIS before deciding to close the Support Center. Assuming arguendo that the Coast Guard was in fact required to prepare an EIS but failed to do so, thus violating NEPA, Plaintiffs are not "automatically" entitled to injunctive relief. *Town of Huntington*, 884 F.2d at 651; *Sierra Club v. Hennessy*, 695 F.2d 643, 648 (2d Cir.1982) ("A violation of NEPA does not necessarily require a reflexive resort to the drastic remedy of an injunction."); *D'Agnillo*, 738 F.Supp. at 1456 (collecting cases). Even assuming a violation of NEPA, Plaintiffs are still required to demonstrate that the historic structures face "actual and imminent" irreparable harm in the absence of an injunction. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir.1995); *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 755 (2d Cir. 1977).

Plaintiffs' only allegation of irreparable harm is that the historic structures on Governors Island will not receive the same degree of maintenance after the closure of the Support Center as they have been receiving while there has been a "living presence" on the island. May 1 Tr. at 6. There is, however, a fully executed "Programmatic Agreement" in place between the Coast Guard, the

---

5. Although the *pro se* "affirmation" originally submitted by Plaintiffs in support of the Order to Show Cause for Preliminary Injunction and Temporary Restraining Order alleged several other types of irreparable harm, Plaintiffs' counsel pre-

sented no argument on those additional points in either Plaintiffs' legal memorandum or at the oral argument. Accordingly, the Court does not address those additional allegations of irreparable harm.

General Services Administration, the Advisory Council on Historic Preservation, the New York State Historic Preservation Officer, the City of New York, and the National Trust for Historic Preservation that sets forth a plan for the care of the island's historic structures following closure of the Support Center. The Programmatic Agreement requires that the Coast Guard, after the closure of the Support Center, provide a facility maintenance staff of approximately 24 employees on the island to perform specific maintenance functions (detailed in the Programmatic Agreement) for both the historic and non-historic facilities there. The Programmatic Agreement also provides for a fire fighting staff of at least five career firefighters and a security staff of at least two roving security guards to be on duty on the island at all times.

Plaintiffs' counsel candidly acknowledged at oral argument that the Programmatic Agreement, which was executed after the preliminary injunction motion was fully briefed, went "a long way" toward alleviating Plaintiffs' concerns. *Id.* at 16. Plaintiffs also concede that the Programmatic Agreement has rendered their claims of irreparable harm premised on NHPA § 106 moot. *Id.* at 5.

The Court agrees with Plaintiffs' counsel's frank concession that the Programmatic Agreement reduces the risk of adverse impact on the historic structures post-closure. The Programmatic Agreement's detailed plan for the preservation of the island's historical structures after closure, even if it does not nullify the risks of harm to the structures, precludes the Court from finding that the closure presents any "actual" and "imminent" threat of irreparable harm to the historical structures.

To the extent that Plaintiffs raise the specter of irreparable harm flowing from the ultimate disposal of the island by the Coast Guard, its claims at this juncture are merely speculative. Regardless of the existence of an apparent plethora of parties interested in Governors Island, those parties will have access to the island only if and when the Coast Guard decides to "excess" the property and the GSA subsequently makes it available for

sale. Counsel for the Coast Guard has now represented several times to the Court that *no* decisions have been made as to disposal of the island, nor are any negotiations in progress with respect to reuse of the island. *Id.* at 19–20. The Coast Guard has also represented both in its legal memorandum and at oral argument that "should the Coast Guard determine that it no longer needs the property—*[it] intends to prepare an EIS in connection with that disposition.*" Gov. Mem. in Opp. to Pl.'s Mot. for Prel. Inj. at 15; May 1, Tr. at 33.

In light of the above, it would be an abuse of discretion to issue an injunction based upon the mere prospect that the Coast Guard will at some future time dispose of Governors Island. As the Second Circuit has wisely warned, "[c]ourts have no business adjudicating the legality of non-events." *National Wildlife Federation v. Goldschmidt,* 677 F.2d 259, 263 (2d Cir.1982); *see also Mobil Oil Corp. v. FTC,* 562 F.2d 170, 173 (2d Cir.1977) ("NEPA does not intend that [an agency] may be indefinitely delayed in undertaking its statutory duties by controversy over an EIS concerning events which may never occur."). In addition, the Coast Guard's representation that it will address the environmental effects of disposal of the island by preparing an EIS if and when it decides to reuse or to sell the Island renders the Court unable to "assume that [the Coast Guard] will not comply with [its] NEPA obligations in [this] later stage of development." *Conner v. Burford,* 848 F.2d 1441, 1448 (9th Cir.1988) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989); *see also Hill,* 1995 WL 110597, at *3 (finding no irreparable harm from planned construction of housing where "plans for development remain on the drawing board [and] [c]onstruction is not close at hand"); *Stand Together Against Decay, Inc. v. Board of Estimate,* 690 F.Supp. 1192, 1198 (E.D.N.Y.1988) (declining to enjoin proposed condemnation of land where there would be a "time lag" between land acquisition and significant environmental change during which defendants were required to give notice to

ensure that change to the environment could be challenged if necessary); *L.S.S. Leasing Corp.*, 579 F.Supp. at 1569 (finding no irreparable harm on motion for injunction based in part on NEPA seeking to enjoin proceeding with and planning for construction of building where building not scheduled for completion for two-and-a-half years).

The Court therefore finds that Plaintiffs fail to demonstrate the probability of irreparable harm in the absence of a preliminary injunction. Accordingly, the Court does not reach the question of likelihood of success on the merits. The motion for a preliminary injunction is denied.

### CONCLUSION

For the reasons stated above, Plaintiffs' application for a preliminary injunction is denied for failure to make the requisite showing of irreparable harm. The Court also denies Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and grants Plaintiffs' motion to amend the complaint to the extent specified. The merits of this action are the subject of Defendants' pending motion to dismiss, or in the alternative for summary judgment, a decision on which will be forthcoming after the parties submit supplemental memoranda of law.

**SO ORDERED.**