**Joseph M. DeSTEFANO, Plaintiff,**

v.

**Jean Somers MILLER, et al., Defendants.**

**No. 96 CIV. 9124 (CM).**

United States District Court, S.D. New York.

Sept. 10, 1999.

---

Alex Smith, Middletown, NY, for plaintiff.

George A. Alvarez, N.Y.S. Dept. of Law, Christopher Adam Quaranta, Office of the Attorney General, New York City, for defendants.

## DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Plaintiff Joseph M. DeStefano ("Plaintiff" or "DeStefano"), the Mayor of Middletown, New York, asserting standing as a taxpayer, challenges the expenditure of funds by the State of New York (the "State") to support the operations of the Middletown Alcohol Crisis Center (the "MACC") by the Emergency Housing Group ("EHG") on State-owned property in Middletown, New York. DeStefano alleges that the expenditure of State funds violates the Establishment Clause of the U.S. Constitution because MACC staff members encourage clients to attend meetings of Alcoholics Anonymous ("AA") held at the facility and because MACC provides AA-related materials to its clients. Defendants contend both that Plaintiff lacks standing to bring this suit and that State support for the MACC does not violate the Establishment Clause. The case is before this Court on Plaintiff's motion for summary judgment and the State's and individual defendants' cross-motion for summary judgment. For the reasons stated below, I find that Plaintiff has standing to bring this Establishment Clause challenge, but that Defendants are entitled to summary judgment on the merits of the claim.

## I. The Factual Allegations [1]

Plaintiff is a New York State taxpayer who resides in the City of Middletown, New York. *See* Pl.'s Rule 56.1 Stmt., ¶ 1.

---

**1.** The following facts, some of which were included in an Order of this Court, dated August 1, 1997 (Jones, J.) (the "8/1/97 Opinion"), are culled from the Amended Complaint, Plaintiff's Rule 56.1 Statement in Support of his Motion for Summary Judgment ("Pl.'s Rule 56.1 Stmt."), Plaintiff's Proposed Findings of Fact (from the Amended Pre–Trial Order), and Stipulated Facts (from the Amended Pre–Trial Order), as well as undisputed facts offered by Defendants.

The individual state defendants are: Jean Somers Miller, Commissioner of the New York State Office of Alcoholism and Substance Abuse Services ("OASAS"); James L. Stone, Commissioner of the New York State Office of Mental Health; and Brian Wing, Commissioner of the New York State Office of Temporary and Disability Assistance (formerly the Department of Social Services). EHG is an independent contractor that operates four public service programs on State-owned property in Middletown: an adult/family shelter for homeless families and individuals, a Friends House Runaway Youth Shelter, an Aftercare/Homeless Prevention Program, and the MACC. *See id.*, ¶ 7.

The MACC is a non-medical, short-term, detoxification center. *See* Stipulated Facts, at 3. The MACC can be analogized to an emergency room at a conventional hospital. It serves persons "in crisis" as opposed to those seeking outpatient treatment. *See id.* Generally, persons are admitted into the MACC because they are intoxicated at the time of admission. However, if a person is not intoxicated, he can be admitted if he is voluntarily seeking a safe, sober environment and feels that his sobriety is threatened. *See id.* All MACC clients are there of their own volition and sign an acknowledgment that they can leave at any time. No one is compelled to stay at the MACC against his wishes. *See* Defs.' Rule 56.1 Stmt., ¶ 6. No state employees or agencies play any role in placing individuals at the MACC. In fact, there is no state action whatsoever in the placement process.

Approximately 700 persons received treatment at the MACC in 1996, each for at least one night. The average stay lasts three to five days. *See* Plaintiff's Proposed Findings of Fact, at 6.

The MACC receives approximately $500,000 in State funds from OASAS, through the Orange County Department of Mental Health to EHG.[2] *See* Stipulated Facts, at 2. OASAS is a state agency created pursuant to the New York State Mental Hygiene Law and is responsible for, among other things, funding programs, monitoring programs, and providing technical systems for programs that treat alcohol and substance abuse. *See id.*, at 4; *see also* N.Y. Mental Hyg. Law §§ 19.07, 19.15, 21.09 (McKinney's 1996). OASAS provides about $25 million on a yearly basis to alcohol and substance abuse programs in the Mid–Hudson region alone. *See* Stipulated Facts, at 4.

OASAS grants make up 95% of MACC's funding. State taxpayer funds are used to pay the rent and utilities for the building (Wallach Hall) in which the MACC is located. *See id.*, at 2–3. The rent and utilities for MACC's portion of Wallach Hall is approximately $39,000 per year. *See id.*, at 3. As the bulk of MACC's money comes from OASAS, State funds are necessarily expended for staff salaries as well.

The MACC program provides its clients with extensive one-on-one counseling sessions with credentialed alcoholism counselors on its staff. In addition, the MACC also offers clients rap discussion sessions, shows educational videos, and encourages clients to attend regularly-scheduled AA meetings and familiarize themselves with its religiously-imbued "Twelve Steps."[3]

---

2. According to EHG Director John Harper, the remaining 5% of MACC's operating funds comes from the Orange County Department of Social Services, the United Way, and private contributions. *See* Memorandum of Law in Support of Defendant's Cross–Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Motion Br."), at 4 n. 3. The expenditure of County funds is no longer at issue in this action following the Court's dismissal of Plaintiff's claim against the County. *See* 8/1/97 Opinion, at 17.

3. The Twelve Steps of AA are as follows:

    1. We admitted we were powerless over alcohol—that our lives had become unmanageable.
    2. Came to believe that a power greater than ourselves could restore us to sanity.

*See* Defs.' Proposed Facts, at 23; *see also* Transcript of Trial, dated 8/2/99 ("Trial Tr."), at 19.

AA meetings are conducted by a volunteer AA fellowship three days a week in the day room at Wallach Hall. *See* Pl.'s Proposed Facts, at 6–7. The AA meetings at Wallach Hall are open to the general public, as well as to MACC clientele. The AA meetings are posted as part of the MACC's daily schedule. MACC clients are encouraged by MACC staff members to attend the sessions as a proven and valuable resource in the long-term treatment of alcoholism. *See* Defs.' Proposed Facts, at 23–24. However, attendance at the AA meetings is not mandatory, and the meetings are not supervised, conducted or paid for by the MACC,[4] EHG, OASAS, or the State of New York. *See id.*

The MACC day room, located in Wallach Hall, is accessible 24 hours a day. AA literature, including the *Big Book, Daily Reflections,* and pamphlets containing the Twelve Steps, is available there. *See* Stipulated Facts, at 4; *see also* Pl.'s Rule 56.1 Stmt., ¶ 15.

> 3. Made a decision to turn our will and our lives over to the care of God *as we understood him.*
> 4. Made a searching and fearless moral inventory of ourselves.
> 5. Admitted to God, to ourselves and to another human being the exact nature of our wrongs.
> 6. Were entirely ready to have God remove all these defects of character.
> 7. Humbly asked Him to remove all of our shortcomings.
> 8. Made a list of all persons we had harmed, and became willing to make amends to them all.
> 9. Made direct amends to such people wherever possible, except when to do so would injure them or others.
> 10. Continued to take personal inventory and when we were wrong promptly admitted it.
> 11. Sought through prayer and meditation to improve our conscious contact with God, *as we understood Him,* praying only for knowledge of His will for us and the power to carry that out.

## II. Procedural Background

Plaintiff originally pleaded state and federal claims, sounding in the First Amendment and public nuisance law, against a number of state, municipal, corporate and individual defendants. In a series of Orders, The Hon. Barbara S. Jones declined to exercise supplemental jurisdiction over the state law claims and dismissed DeStefano's suit as against several of the original defendants, leaving only the State and the three individual state employees (collectively, the "Defendants") before this Court. In March 1998, Plaintiff moved, and the Defendants cross-moved, for summary judgment on Plaintiff's sole remaining claim: that the State's financial support of the MACC violates the Establishment Clause of the First Amendment because MACC staff members encourage or coerce clients to involve themselves in AA and Twelve Step-related activities—AA being a program which the Second Circuit and the New York State Court of Appeals have held constitutes religious exercise for Establishment Clause purposes. *See Warner v. Orange County Dep't of Probation,* 115 F.3d 1068, 1075 (2d Cir.1996); *Griffin v. Coughlin,* 88 N.Y.2d 674, 683, 649 N.Y.S.2d

> 12. Having had a spiritual awakening as a result of these steps, we tried to carry this message to alcoholics, and to practice these principles in all our affairs.
>
> Stipulated Facts, at 3–4.

4. The parties dispute whether MACC staff members show AA videos containing Twelve Step methodology to clients, although there is no question that such videos are available for viewing at the MACC. *See* Pl.'s Proposed Facts, at 11; *see also* Deposition of John Harper, Executive Director of EHG, attached as Exhibit 2 to Plaintiff's Notice of Motion, at 40, 43–45; Amended Pre–Trial Order, at 23 (Defendants' Contentions); Trial Tr., at 14–16. Accordingly, an argument may be made that a fraction of the MACC staff salaries is expended on supervising AA-related *activities* (albeit not AA meetings). However, as there is undisputed evidence that State funds pay a significant portion of the salaries of MACC staff members, and that those staff members actively encourage clients to participate in AA, there is no need to resolve this dispute.

903, 908, 673 N.E.2d 98 (1996), *cert. denied,* 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997). The case was later transferred to me with these motions still pending.

In his motion papers, Plaintiff originally pressed two alternative, but overlapping, theories of liability. First, he asserted that State funding of a program that offers its participants access to AA—even on a voluntary basis—is *per se* unconstitutional, government-supported, religious indoctrination. In the alternative, he argued that State-funded MACC counselors directly compel the unusually susceptible MACC clients ("substance abuser[s] in crisis")[5] to accept theistic Twelve Step doctrine and to participate in AA counseling, thus violating the Establishment Clause.[6] Defendants denied using coercion, but did not dispute that employees at MACC encourage the patients there to participate in the Twelve Step methodology of AA. Indeed, Defendants concede that "[MACC] clients are 'strongly' urged to attend AA programs as a very effective means of treatment." Defs.' Motion Br., at 14.

After reviewing the motion papers, I concluded that the only disputed issue of fact that needed to be resolved was whether the State, through MACC, *coerces* its clients to participate in AA, or whether clients have a reasonable, voluntary alternative to religious activity. *See* 6/21/99

Order. I instructed the parties, in accordance with this determination, to prepare for a trial on August 2, 1999 to resolve the limited question of coercion. *See id.* That trial proved unnecessary because Plaintiff arrived on August 2, 1999 and offered—notwithstanding his previous contrary submissions—to stipulate that the MACC has not, and does not, compel its clients, psychologically or otherwise, to participate in AA programs, Twelve Step counseling, or any other religious activity of any kind. *See* Trial Tr., at 18–20. Rather, Plaintiff disavowed all allegations of coercion, including those submitted in sworn statements to the Court, labeling them elements of a "separate backup argument" he now wishes to abandon. *See* Trial Tr., at 22. In so doing, Plaintiff explicitly limited himself to asserting that State funding of a facility like MACC (where Defendants concede that the clients—all of whom are voluntarily present, none of whom is there at the State's behest—are encouraged to participate in AA) is *per se* unconstitutional. *See* Trial Tr., at 17.

### III. *Legal Discussion*

There are two issues for the Court to resolve here: (1) whether DeStefano has standing, as a State taxpayer, to challenge MACC's involvement with AA-related activities as a violation of the Establishment Clause; and (2) if DeStefano has standing,

5. Plaintiff's Memorandum of Law in Support of Summary Judgment ("Pl.'s Motion Br."), at 13.

6. *See, e.g.,* Amended Complaint, ¶ 24 (alleging, upon information and belief, that the EHG, through the MACC, "endorses, utilizes and promotes the Twelve Step doctrine and *induces* its participants to work the Twelve Steps, accept its doctrine and incorporate it into their daily lives") (emphasis added); Pl.'s Motion Br., at 13 ("[p]racticing purportedly state-of-the-art therapeutic techniques, MACC counselors actively promote a theistic form of understanding to disoriented, suffering people who are in desperate need of psychological and emotional support"), 9 ("MACC clients are being *required* to attend AA meetings, watch AA videos, read AA literature, select an AA sponsor, and give their 'total commitment

and involvement in an A.A./N.A. group'" (quoting the MACC Policies and Procedures Manual)), 12 ("[t]he State is paying MACC and its counselors to *indoctrinate vulnerable addicts* ...") (emphasis added); *see also* Affidavit of William Hentschel, ¶ 2 ("I resided at the [MACC] for one week in January of 1995. I was there voluntarily. However, during my stay there, I was required—like all other residents—to attend Alcoholics Anonymous (AA) meetings held in the day room of the Crisis Center."). As this Court observed in its Decision and Order Reserving Judgment on Plaintiff's Motion and Defendants' Cross–Motion for Summary Judgment, dated June 21, 1999 (the "6/21/99 Order"), Mr. Hentschel is not competent to give testimony concerning the alleged coercion of other MACC clients.

whether either side is entitled to summary judgment on the merits of this dispute.

## A. Taxpayer Standing

### 1. *Law of the Case Does Not Wholly Bar an Inquiry Into Plaintiff's Standing*

Plaintiff argued at the August 2 hearing that Judge Jones had already decided the standing issue in her August 1, 1997 Opinion, and that Defendants were therefore precluded from re-litigating the question. DeStefano is incorrect. The "law of the case" doctrine does not bind the Court in the manner Plaintiff suggests.

■ The law of the case doctrine provides that "if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 131 (2d Cir.1997) (internal quotation marks and citation omitted). The doctrine "is, at best, a discretionary doctrine, which does not constitute a limitation on the court's power but merely expresses the general practice of refusing to reopen what has been decided." *Id.* The doctrine, however, does not wholly bar an inquiry in this situation. In her August 1, 1997 Opinion, Judge Jones was deciding a motion to dismiss. She held that Plaintiff had properly *alleged* the facts necessary to sustain a claim of taxpayer standing against the State. That ruling did not foreclose the possibility that Defendants might present factual arguments that would defeat Plaintiff's standing on a motion for summary judgment. Indeed, the Court invited precisely that approach when it denied Defendants' motion to reargue the motion to dismiss, noting that the "State defendants' factual arguments may, of course, be raised on a proper motion for summary judgment." *See* Memorandum and Order, dated 9/19/97 (Jones, J.), at 3 n. 2.

Nonetheless, the issue of Mayor DeStefano's assertion of taxpayer standing was exhaustively discussed by Judge Jones in the August 1, 1997 Opinion, and while De-fendants now make their factual arguments in the appropriate forum, I find them unpersuasive in light of Judge Jones's well-reasoned analysis of the law of taxpayer standing, which is contained in pages 10 through 17 of the August 1, 1997 Opinion. Moreover, Judge Jones rejected certain purely legal arguments proffered by Defendants, and those rulings *are* law of the case and will not be disturbed. *See* pp. 14–16 *infra.*

### 2. *Background on the Law of Standing*

■ In order to invoke this Court's jurisdiction, a plaintiff must demonstrate that: (1) he personally suffered some actual or threatened injury as a result of the defendant's putatively illegal conduct; (2) the injury fairly can be traced to the challenged action; and (3) the injury is likely to be redressed by a favorable decision. *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Within this standard, a plaintiff, challenging a purported unconstitutional exercise of power may assert state taxpayer standing by meeting two tests: (i) the "[t]axpayer must establish a logical link between [his status as a taxpayer] and the type of legislative enactment attacked," and (ii) the "[t]axpayer must establish a nexus between [taxpayer] status and the precise nature of the constitutional infringement alleged." *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *see also Doremus v. Board of Educ. of Hawthorne,* 342 U.S. 429, 434–35, 72 S.Ct. 394, 96 L.Ed. 475 (1952) (analogizing state taxpayers to federal taxpayers for purposes of standing).

Defendants concede that Plaintiff has met *Flast*'s second prong, in that DeStefano asserts a violation of the Establishment Clause, which is sufficient to establish a nexus between taxpayer status and the precise nature of the constitutional infringement alleged. *See Lamont v.*

*Woods,* 948 F.2d 825, 830 (2d Cir.1991). Defendants dispute, however, whether DeStefano has established the "logical link" necessary to assert state taxpayer standing.

■ The courts have generally limited taxpayer standing to cases where the plaintiff challenges a legislative exercise of power under the taxing and spending clause of the United States Constitution, Art. I, § 8, or a state's equivalent. *See Lamont,* 948 F.2d at 829 (federal taxpayer standing); *Bell v. City of Kellogg,* 922 F.2d 1418, 1423 (9th Cir.1991) (state taxpayer standing). Thus, allegations of injury without financial expenditure are not enough to support taxpayer standing; Plaintiff must bring a "good-faith pocketbook action," *Doremus,* 342 U.S. at 429, 72 S.Ct. 394, and not merely a claim based on "an incidental expenditure of tax funds in the administration of an essentially regulatory statute," *Flast,* 392 U.S. at 102, 88 S.Ct. 1942.

■ "Although the [Supreme] Court has repeatedly indicated that taxpayer standing is not a growth industry," *Lamont,* 948 F.2d at 830 (citing cases), the one area in which the *Flast* exception has recently been expanded is in federal taxpayer suits raising Establishment Clause challenges to congressional spending through a federal agency. *See id.* (citing *Bowen v. Kendrick,* 487 U.S. 589, 618–20, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988)). A plaintiff taxpayer alleging an Establishment Clause violation has standing to challenge funding administered by the executive branch if it has been "authorized" by the legislature. *See Bowen,* 487 U.S. at 618, 108 S.Ct. 2562. The Second Circuit, construing *Bowen,* instructed courts to assess whether a putative taxpayer plaintiff challenges funding that is disbursed pursuant to statutory mandate. *See Lamont,* at 830. If he does, then the plaintiff has established a sufficient nexus between his standing as a taxpayer and the legislature's exercise of its taxing and spending power, notwithstanding the fact that a governmental agency administers the statute. *See id.*

### 3. On the Undisputed Facts, Defendants' Standing Arguments Lack Merit

■ Defendants make two arguments concerning standing: (a) the State funds fairly attributable to AA-related activities at the MACC are so minimal that they cannot satisfy the injury requirement of *Doremus,* 342 U.S. at 429, 72 S.Ct. 394 (a "good-faith pocketbook action") and *Flast,* 392 U.S. at 102, 88 S.Ct. 1942 (not merely "an incidental expenditure of tax funds in the administration of an essentially regulatory statute"); and (b) that the disbursement of funds to OASAS is not the result of the State legislature's "tax and spend" power, but is actually incidental to a regulatory statute. On this basis, Defendants contend, DeStefano has not established a logical link between his taxpayer status and state spending pursuant to a legislative enactment.

### a) Standing Analysis Part 1: Plaintiff Has Established a Good–Faith Pocketbook Injury

Defendants calculate that the space occupied by AA programs at Wallach Hall costs taxpayers scarcely $50 over the course of an entire year, reprising a sophistic argument first articulated by defendant EHG in its motion to dismiss. Putting aside Defendants' failure to include any payroll or staff-related costs in this calculation (and they cannot be omitted in light of Defendants' concession that MACC's staff encourages its clients to participate in AA), Defendants' figure bolsters Plaintiff's contention that the State spends a measurable amount of taxpayer dollars, (albeit an infinitesimal one per capita), on a program that supports religious activity. That is all DeStefano must do to assert taxpayer standing to challenge an Establishment Clause violation under *Flast* and its progeny.

Defendants argue, citing *Board of Education v. New York State Teachers Retirement System,* 60 F.3d 106, 110 (2d Cir. 1995), that the Second Circuit has construed *Doremus* to require a more significant injury for DeStefano to invoke taxpayer standing. However, Defendants misread the holding of that case. In fact, the Court, in *Board of Education,* held merely that disgruntled taxpayers could not challenge government action based solely on the assertion that they paid taxes to the state. The plaintiffs had to allege some financial injury, *i.e.,* some use of taxpayer funds in support of the offending government activity. *See id.,* 60 F.3d at 110. *Doremus* cannot require more than a showing of some direct expenditure of taxpayer funds; otherwise, no plaintiff in a state with as large a tax base as New York's would ever be able to challenge an Establishment Clause violation unless a "special tax assessment was levied to pay for the expenditure." *Minnesota Federation of Teachers v. Randall,* 891 F.2d 1354, 1358 (8th Cir.1989).

### b) Standing Analysis Part 2: Plaintiff Has Established a Logical Link Between His Taxpayer Status and a Legislative Expenditure

Defendants' second argument was offered by EHG and rejected by this Court in its August 1, 1997 Opinion. Judge Jones wrote, "[I]t is clear [from the pleadings] that the plaintiff questions legislative action, and not merely an executive branch decision; OASAS is carrying out the dictates of the legislature's statutory scheme, namely the Mental Hygiene Law." *See* 8/1/97 Opinion, at 16. Judge Jones also specifically rejected Defendants' argument, reasserted here, that the expenditures at issue were made pursuant to the New York State Constitution, Art. XVII, § 4 (concerning treatment for mental disorders and defects), rather than Art. VII, § 7, the state "general welfare" provision

akin to the federal tax and spend clause. *See id.,* at 15–16 & n. 10 (decrying the lack of evidence to support this assertion; "[t]his argument is without merit"). These legal conclusions by my predecessor are law of the case, and cannot be revisited by me.

DeStefano argues that, through the enactment of Mental Hygiene Law Article 19, the New York State Legislature established in OASAS "a program of disbursement of funds" akin to the federal agency's mandate in *Bowen v. Kendrick,* in which the Court upheld standing, but then rejected a facial challenge to a federal statute authorizing spending on behalf of religious organizations. *See Bowen,* 487 U.S. at 619, 108 S.Ct. 2562. Article 19 directs the OASAS commissioner to "execute the policies of the state concerning alcoholism and substance abuse services"[7] and subdivision (1) of section 19.09(e) provides: "[i]n furtherance thereof, within the amounts made available by appropriation and with the approval of the division of the budget, the commissioner shall have the authority to make grants or enter into agreements with alcoholism or substance abuse programs, or other appropriate entities."[8] Moreover, appropriations to OASAS, and by extension its disbursements, enjoy the implicit approval of the New York state legislature. The New York Court of Appeals has held that Article VII, § 7 of the state constitution provides the legislature with the power "to pass upon all expenditures from the treasury." *Anderson v. Regan,* 53 N.Y.2d 356, 364–65, 442 N.Y.S.2d 404, 425 N.E.2d 792 (1981).

Thus, under Article 19, a legislative enactment, OASAS disburses tens of millions of State taxpayer dollars every year to alcohol and substance abuse programs. *See* Stipulated Facts, at 4. As was true in *Lamont,* Plaintiff alleges that OASAS disbursed State funds to MACC, some of which found their way to AA, in accor-

---

**7.** N.Y. Mental Hyg. Law § 19.09(e) (McKinney's 1996).

**8.** *Id.*

dance with the mandate of the State legislature. These circumstances, the *Lamont* Court held, are not substantially different from the facts in *Flast* and *Bowen,* where the Supreme Court upheld assertions of taxpayer standing because Congress had authorized, but not mandated, the provision of federal funds to religious organizations. *See Lamont,* at 830 & n. 2 (citing *Flast* and *Bowen* ). It does not defeat standing to argue that the statute authorizing OASAS permitted, rather than required, the funding arrangement at issue here. *See id.*

Judge Jones's ruling that Plaintiff has satisfied the "logical link" requirement of challenging a legislative expenditure is a legal conclusion and I am bound to honor it.

Accordingly, I find that DeStefano has alleged facts sufficient to assert taxpayer standing to challenge the State's funding of the MACC as an Establishment Clause violation.

### 4. *Prudential Considerations*

■ This Court's determination that Mayor DeStefano has satisfied the constitutional prerequisites for taxpayer standing does not conclude the matter. The Supreme Court has developed a doctrine of standing that embraces both "constitutional" and "prudential" requirements to protect the limited purpose of Article III jurisdiction. *See Sullivan v. Syracuse Hous. Auth.,* 962 F.2d 1101, 1106 (2d Cir. 1992) (citing cases). This Court has discretionary authority to deny standing for "prudential reasons," even if Plaintiff has satisfied the constitutional minima of standing, as for example because the asserted injury constitutes a 'generalized grievance' that is more appropriately addressed in the representative branches. *See Lamont,* 948 F.2d at 829 (citing *Allen*

*v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

■ Prudential considerations generally counsel that a plaintiff may not base his claim on the legal rights of a third-party and that the interest asserted should be within the zone of interests protected by the constitutional guarantee in question. *See Sullivan,* 962 F.2d at 1106. The analysis necessarily centers on whether a particular plaintiff is the proper party to request adjudication of this issue—not on the nature of the claim itself. *See Lamont,* at 831. Press reports included in the record suggest that Mayor DeStefano's suit is part of an orchestrated campaign to rid his community of social services organizations and their unwanted clientele, rather than a bona fide Establishment Clause challenge by an individual taxpayer committed to First Amendment advocacy.[9] This suggestion appears valid in light of the nuisance claim, dismissed by Judge Jones, in which DeStefano sought damages from the State for creating a public nuisance by assembling at the MACC a "dumping ground for residents that are criminal and dangerous to themselves, other [MACC] residents . . . and residents and businesses of the surrounding community." Amended Complaint, ¶ 31. While an analysis of standing does not involve scrutiny of a plaintiff's motivation in bringing an action, *see Doremus,* 342 U.S. at 434–35, 72 S.Ct. 394, DeStefano must still show, via the taxpayer injury he has alleged, that he has a "direct and personal stake in the controversy." *Sullivan,* at 1107. In *Sullivan,* the plaintiff challenged religious teachings in a state-supported public housing facility's community center, alleging injuries from his own inability to use the center and from the exposure of his son to unwelcome religious teachings. *See id.,* at 1108–09. The *Sullivan* Court expressly distin-

---

9. *See* "Middletown needs talk, not a lawsuit," *Middletown Times Herald Record,* Dec. 8, 1996, editorial page (decrying Mayor DeStefano's frequent complaints that "Orange County sends a disproportionate number of its wel-

fare clients to Middletown") (attached as Exhibit "C" to Affidavit of James Sweeney in Support of Defendant Emergency Housing Group, Inc.'s Motion to Dismiss Complaint).

guished plaintiff's parental interest and injury from the general prudential bar against invoking standing to assert the interests of third-parties. *See id.*, at 1109.

DeStefano has not demonstrated a similar direct, personal stake in the spiritual activities at the MACC. Plaintiff is not, and never has been, a client at the MACC, so he cannot allege any personal deprivation there, and he enjoys no special legal or emotional relationship with any MACC clients such that he could claim any injury to himself from their exposure to religious activities during their voluntary stays. In fact, any claim by DeStefano that he acts on behalf of the MACC clients is not credible in light of the Amended Complaint, which assailed many of the MACC clients as "persons with criminal and violent propensities" (Amended Complaint, ¶ 34).

Thus, DeStefano's assertion of standing rests entirely on his allegation that the flow of State taxpayer funds, which benefits AA through MACC staff involvement, deprives him of his right "under the First Amendment, as a taxpayer, to be free from government sponsored and funded religious practice." *Id.*, ¶ 29. While the Supreme Court has recognized that a party's "spiritual stake in First Amendment values" may be sufficient to confer standing in Establishment Clause cases, *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Court has also cautioned that the judicial process should not be converted into "a vehicle for the vindication of the value interests of concerned bystanders." *Valley Forge Christian College*, 454 U.S. at 473, 102 S.Ct. 752 (internal quotation marks omitted). This Court is unaware of any other actions that DeStefano has taken which manifest his deep-seated commitment to First Amendment jurisprudence, apart from his collaboration in what appears to be a politically-motivated dispute with two capable attorneys who have successfully opposed the compulsory use of AA in state institutions. *See Warner v. Orange County Dep't of Probation*, 115 F.3d 1068 (2d Cir.1996); *Griffin v. Coughlin*, 88 N.Y.2d 674, 649 N.Y.S.2d 903, 673 N.E.2d 98 (1996), *cert. denied*, 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997). Moreover, this Plaintiff is suspect for other reasons, as well. DeStefano's stark and expedient disavowal of the "compulsion" and "indoctrination" language that animates his pleadings and motion papers—at an instant when doing so will expedite his opportunity to appeal to the Second Circuit—diminish the credence of those avowed First Amendment values which allegedly motivated this action in the first instance.

■ However, where First Amendment claims are asserted, discretionary prudential considerations should, it seems to me, yield to the paramount need to resolve fundamental questions of law. Therefore, while this Court doubts both Plaintiff's sincerity and the nature and degree of the injury he feels, I am constrained to exercise my discretion in favor of according him standing. Ultimately, it makes no difference to the outcome of the case because, as I conclude below, Defendants are entitled to summary judgment on the merits of the Establishment Clause challenge.

## B. *The Merits of Plaintiff's Establishment Clause Claim*

The Establishment Clause provides: "Congress shall make no law respecting an establishment of religion...." U.S. CONST. amend. I. As the Supreme Court held in *Everson v. Board of Education*, the first case applying the Establishment Clause to the States:

> The "Establishment of Religion" clause of the First Amendment means at least this:. Neither a state nor the Federal Government can set up a church.... Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion.

330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (Black, J.).

The Court set forth the governing principles for determining whether the Establishment Clause has been violated in a given case, in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The *Lemon* Court articulated three tests for whether a statute violates the Establishment Clause, though only the latter two are at issue here: (1) the statute must have a secular legislative purpose; (2) its principal or primary effect must neither advance nor inhibit religion; and (3) the statute must not foster "an excessive government entanglement with religion." 403 U.S. at 612–13, 91 S.Ct. 2105.

In *County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), a later Establishment Clause case, the Court added an "endorsement" component to the *Lemon* test, holding:

> Whether the key word is "endorsement," "favoritism," or "promotion," the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from making adherence to a religion relevant in any way to a person's standing in the political community.

*Id.* at 592–94, 109 S.Ct. 3086 (citations omitted). The Court, in *Allegheny,* applied its test to publicly funded religious holiday displays and reached the somewhat anomalous conclusion that having a crèche in a county courthouse violated the Establishment Clause, but a display containing a menorah and a Christmas tree—both of which symbolize what are fundamentally religious holidays—did not.

By contrast, in *Bowen v. Kendrick,* the Court rejected a facial challenge to a federal statute authorizing grants to public and private non-profit organizations for research in the areas of adolescent premarital sex and pregnancy. *See id.,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). The Court upheld the constitutionality of the Adolescent Family Life Act notwithstanding the statute's explicit contemplation that religious organizations might receive federal funds under the program. In doing so, the Court rejected the District Court's conclusion that involving religious organizations in a federal program addressing social problems among adolescents necessarily has the effect of advancing religion. *See id.,* at 611, 108 S.Ct. 2562.

The Court has emphasized different factors in other Establishment Clause cases, such as the environment in which government advancement of religion is alleged, or whether and how children are affected. *See, e.g., Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). In *Lee,* the Court held that a public school could not provide for a "nonsectarian" prayer to be given at graduation by a clergyman it selected because the degree of school involvement lent the graduation prayers "the imprint of the State and thus put school-age children who objected in an untenable position." *Id.,* at 590, 112 S.Ct. 2649. The Court grounded its holding in a "heightened" concern for protecting the individual's freedom of conscience from coercive pressure in elementary and secondary public schools, noting that the "concern may not be limited to the context of schools, but it is most pronounced there." *Id.,* at 592, 112 S.Ct. 2649. Brushing aside a stipulation from the trial court that attendance at high school graduation ceremonies is voluntary, the Court concluded that, because of the societal norms surrounding these rituals, "it is apparent that a student is not free to absent herself from graduation exercise in any real sense of the term 'voluntary'...." *Id.,* at 595, 112 S.Ct. 2649.

The *Lee* Court's holding has been invoked, in recent years, as courts scrutinize state-compelled participation in AA. *See, e.g., Griffin v. Coughlin,* 88 N.Y.2d 674, 649 N.Y.S.2d 903, 673 N.E.2d 98 (1996), *cert. denied,* 519 U.S. 1054, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997); *Warner v. Orange*

*County Dep't of Probation,* 115 F.3d 1068 (2d Cir.1996). The New York State Court of Appeals confronted the issue in *Griffin,* where it held that a state prisoner's family visitation privileges could not be conditioned upon his participation in a treatment program that incorporated the Twelve Steps of AA. *Id.,* 88 N.Y.2d at 677, 649 N.Y.S.2d at 904, 673 N.E.2d 98. The *Griffin* Court looked to the school Establishment Clause cases, such as *Lee,* for analogs to the prison inmate who is exposed to religious activity while held against his will in the "inherently authoritarian atmosphere of a prison." 88 N.Y.2d at 692–93, 649 N.Y.S.2d at 913, 673 N.E.2d 98. It concluded that the prisoner in *Griffin* was in the same position as the student in *Lee,* in that the peculiarly coercive circumstances of conditioning a desirable privilege on the custodial inmate's participation in a religious program amounted to a constitutional violation. Applying *Lee,* the Court of Appeals held: "[t]hus, it follows that the Shawangunk Correctional Facility may not constitutionally require petitioner 'to forfeit his ... benefits [eligibility for the Family Reunion Program] as the price of resisting conformance to state-sponsored religious practice.' " *Griffin,* 88 N.Y.2d at 687, 649 N.Y.S.2d at 911, 673 N.E.2d 98 (quoting *Lee* ) (modification in original).

The *Griffin* Court highlighted the importance that compulsion and state custodial control played in its decision: "It is simply unimaginable that inmates in the inherently authoritarian atmosphere of a prison would not perceive that such a mandatory, exclusive program, facially containing expressions and practices that 'ha[ve] always been religious' favors inmates who adhere to those beliefs, and symbolically condones the religious proselytizing those expressions literally reflect." *Id.,* at 691–92, 649 N.Y.S.2d at 913, 673 N.E.2d 98 (citations omitted; modification in original) (quoting *Engel v. Vitale,* 370 U.S. 421, 424–25, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), a landmark school Establishment Clause case). At the same time, however, the Court took pains to emphasize that its holding did not preclude the use of AA in state prisons on a voluntary basis:

> Our holding does not interfere with any inmate's free choice to avail him or herself of A.A. religious practices in a prison setting to combat alcohol or drug addiction, or freely to enter into the present [AA-based alcohol treatment] Program. Rather, our ruling identifies as the critically objectionable aspect of respondent's correctional policy here, the application of coercive pressure upon petitioner to attend and participate in a religious exercise at penalty of losing any possibility for cherished, expanded family contacts.

*Griffin,* 88 N.Y.2d at 694, 649 N.Y.S.2d at 915, 673 N.E.2d 98.

The Second Circuit relied heavily on the *Griffin* Court's reasoning and reached a similar conclusion in *Warner,* finding it unconstitutional for the State to require a probationer to attend AA as a condition of probation. *See Warner,* 115 F.3d at 1075–76 & n. 8. Like the New York Court of Appeals in *Griffin,* the Second Circuit found the *Warner* probationer, who "had little choice but to attend the A.A. sessions," to be similarly situated to the state prisoner who had to participate in AA, on pain of losing family visiting privileges, and to the student in *Lee,* who was effectively compelled to be present at her high school graduation. *Warner,* 115 F.3d at 1075–76. The Court held: "Because sending Warner to A.A. as a condition of his probation, without offering a choice of other providers, plainly constituted coerced participation in a religious exercise, we find a violation of the Establishment Clause." *Id.,* at 1076 n. 8. In each situation (*Warner, Griffin,* and *Lee* ), the courts found that compulsory participation in a religiously-oriented program by a person who was under state supervision violated

the Establishment Clause.[10]

The fair implication of the holdings in *Warner* and *Griffin,* is not, as DeStefano alleges, that entities which receive state funding cannot offer AA to their participants. Rather, to the contrary, the Second Circuit specifically aligned itself with the *Griffin* Court's view that it was the compulsion to participate in AA—not the fact that AA was a treatment option available to probationers (or prisoners) who were under state supervision—which rendered the state action unconstitutional. *See* 115 F.3d at 1075. As the *Warner* Court observed: "Had Warner been offered a reasonable choice of therapy providers, so that he was not compelled by the state's judicial power to enter a religious program, the considerations would be altogether different." *Id.,* at 1075.

Now that DeStefano has stipulated that MACC clients—all of whom are voluntarily present at the facility—are not compelled in any manner to participate in AA, but are merely urged to do so by MACC staff, this action falls beyond the reach of *Griffin, Warner,* and the cases upon which they relied. There is no evidence before me that the MACC accommodates juvenile clients, nor does the record sustain Plaintiff's proffered argument that MACC's voluntarily present adult clients are uniquely susceptible to religious indoctrination and must be protected, like children, by the Court.

Moreover, there is a fundamental difference between the Plaintiffs in *Griffin* and *Warner* and the clients at the MACC. As discussed more fully above, the plaintiffs in those cases were in state custody or under state supervision, whereas the MACC clients have entered a private treatment facility of their own accord. Griffin and

Warner were compelled through state action to participate in AA; at the MACC, there is no analogous state action and, following DeStefano's stipulation, no allegation of compulsion. Finally, there is insufficient "entanglement" between the MACC and AA to create an Establishment Clause violation under *Lemon.* AA does not directly receive any money, materials, or administrative support from the State. The only State involvement is that AA meetings are held in Wallach Hall and MACC staff members encourage clients to participate. These facts, without more, do not constitute a First Amendment violation.

DeStefano asks this Court to reach beyond the governing case law and find that State funding of a facility that offers and encourages participation in AA by its voluntary, adult clients as part of a comprehensive alcohol treatment program violates the Establishment Clause. The Supreme Court held clearly in *Bowen* that there is nothing inherently unconstitutional about involving an organization with religious ties in a government-funded program addressing social concerns. Nonetheless, Plaintiff invites me to ignore this precedent as well as a pronouncement by the Second Circuit that aptly describes the use of AA at the MACC—"Had Warner been offered a reasonable choice of therapy providers, so that he was not compelled by the state's judicial power to enter a religious program, the considerations would be altogether different"—and sever state funding of a socially productive treatment center without evidence that its activities offend the Establishment Clause. *Warner,* at 1075. I decline DeStefano's invitation, and I do so relying in particular on the fact that MACC clients have ultimate control

---

**10.** As the Supreme Court explained in *Lee,* a student attending a public high school graduation is under state supervision and is not "free to enter and leave" to avoid religious activity. *Id.,* at 597, 112 S.Ct. 2649. "At a high school graduation, teachers and principals must and do retain a high degree of control over the precise contents of the program, the speeches, the timing, the movements, the dress, and the decorum of the students. In this atmosphere the state-imposed character of an invocation and benediction by clergy selected by the school combine to make the prayer a state-sanctioned religious exercise in which the student was left with no alternative but to submit." *Id.*

over their own presence at the facility, and, hence, whether they are exposed to the religious activities of AA.

Accordingly, this Court finds that the use and encouragement of Alcoholics Anonymous and its related activities at the State-funded Middletown Alcohol Crisis Center does not violate the Establishment Clause. For the reasons stated, summary judgment is granted in favor of Defendants and against the Plaintiff.

This constitutes the decision and order of the Court.